Slip Op. 20-10

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., <br><br> Plaintiff, <br><br> HABAS SINAI VE TIBBI GAZLAR ISTIHSAL ENDUSTRISI A.S., <br><br> Consolidated Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant, <br><br> and <br><br> NUCOR CORPORATION, CHARTER STEEL and KEYSTONE CONSOLIDATED INDUSTRIES, INC., <br><br> Defendant-Intervenors. | Before: Gary S. Katzmann, Judge <br> Consol. Court No. 18-00143 |

## <u>OPINION</u>

[Plaintiffs' motion for judgment on the agency record is granted in part and Commerce's Final Determination is remanded consistent with this opinion.]

Dated: January 28, 2020

Leah N. Scarpelli, Arent Fox LLP, of Washington, DC, argued for plaintiff. With her on the brief were Matthew M. Nolan and Diana Dimitriuc Quaia.

David L. Simon, Law Office of David L. Simon, of Washington, DC, for consolidated plaintiff.

Elizabeth A. Speck, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant *United States*. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, L. Misha Preheim, Assistant Director. Of counsel was Emma Hunter, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC. With her on the brief was Nikki Kalbing.

Maureen E. Thorson, Wiley Rein LLP, of Washington, DC, argued for defendant-intervenor *Nucor Corporation*. With her on the brief were Stephen J. Claeys and Derick G. Holt.

R. Alan Luberda, Kelley Drye & Warren, LLP, of Washington, DC, for defendant-intervenors *Charter Steel and Keystone Consolidated Industries, Inc.*

Katzmann, Judge:   This case involves a challenge to the Department of Commerce's ("Commerce") calculation of antidumping ("AD") duties on carbon and alloy steel wire rod ("wire rod") imported into the United States from Turkey.   Commerce assesses AD duties where merchandise is exported to the United States for sale at a price lower than is or would be charged in the country of origin.   Section 732(b) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673(2).[1]   Here, Turkish producers and exporters of wire rod, Plaintiff Icdas Celik Enerji Tersane ve Ulasim, A.S. ("Icdas") and consolidated-plaintiff Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. ("Habaş") (collectively, "Plaintiffs"), bring this action against the United States ("the Government") to contest certain aspects of Commerce's final determination in the sales-at-less-than-fair-value investigation that resulted in the imposition of AD duties on the wire rod Plaintiffs exported to the United States.   See Carbon and Alloy Steel Wire Rod from Italy, the Republic of Korea, Spain, the Republic of Turkey, and the United Kingdom, 83 Fed. Reg. 23,417 (Dep't Commerce May 21, 2018), P.R. 1289 ("Amended Final Determination").   Specifically, Plaintiffs argue that Commerce's "duty neutral methodology" of adjusting for duty drawback is unsupported by substantial evidence and not in accordance with law.   Habaş also challenges

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19 of the U.S. Code, 2012 edition. Citations to 19 U.S.C. § 1677e, however, are not to the U.S. Code 2012 edition, but to the unofficial U.S. Code Annotated 2018 edition.   The current U.S.C.A. reflects the amendments made to 19 U.S.C. § 1677e (2012) by the Trade Preferences Extension Act of 2015, Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015).   The TPEA amendments are applicable to all determinations made on or after August 6, 2015, and therefore, are applicable to this proceeding.   See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793, 46,794 (Dep't Commerce Aug. 6, 2015).

Commerce's use of a surrogate short-term borrowing rate in lieu of Habaş's reported zero-interest rate to impute credit expenses on home market sales.  For the reasons discussed herein, the court remands Commerce's methodology used to calculate the duty drawback adjustment with instructions to recalculate the adjustment and sustains Commerce's methodology for imputing credit expense on home market sales.

## JURISDICTION, STANDARD OF REVIEW, AND INTERPRETIVE FRAMEWORK

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(i).   The standard of review in this action is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i): "[t]he court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."

The two-part framework established in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), guides the court's review of Commerce's statutory interpretation.  See also Apex Frozen Foods Private Ltd. v. United States, 862 F.3d 1322, 1329 (Fed. Cir. 2017).  Under Chevron's first prong, the court asks "whether Congress has directly spoken to the precise question at issue."  467 U.S. at 842.  See also Apex Frozen Foods, 862 F.3d at 1329.  "If yes, 'that is the end of the matter,' and we 'must give effect to the unambiguously expressed intent of Congress.'"  Apex Frozen Foods, 862 F.3d at 1329 (quoting Chevron, 467 U.S. at 842–43).  If, however, "'the statute is silent or ambiguous with respect to the specific issue,'" the court proceeds to the second prong of the Chevron analysis.  Id. (quoting Chevron, 467 U.S. at 843).  "[T]he question for the court" then becomes "whether the agency's answer is based on a permissible construction of the statute."  Chevron, 467 U.S. at 843.  "A permissible construction

of a statute is one that is reasonable."  ABB, Inc. v. United States, 920 F.3d 811, 824 (Fed. Cir.

2019) (citing Dongbu Steel Co. v. United States, 635 F.3d 1363, 1369–70 (Fed. Cir. 2011)).

## BACKGROUND

### I.      Legal and Regulatory Framework

Pursuant to 19 U.S.C. § 1673, Commerce imposes antidumping duties on foreign goods if

they are being or are likely to be sold in the United States at less than fair value and the

International Trade Commission ("ITC") determines that the sale of the merchandise at less than

fair value materially injures, threatens, or impedes the establishment of an industry in the United

States.  See also Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306 (Fed. Cir.

2017); Shandong Rongxin Imp. & Exp. Co. v. United States, 42 CIT __, __ 331 F. Supp. 3d 1390,

1394 (2018).  "Sales at less than fair value are those sales for which the 'normal value' (the price

a producer charges in its home market) exceeds the 'export price' (the price of the product in the

United States)."  Apex Frozen Foods, 862 F.3d at 1326 (quoting Union Steel v. United States, 713

F.3d 1101, 1103 (Fed. Cir. 2013)).  The amount of the antidumping duty is "the amount by which

the normal value exceeds the export price (or the constructed export price) for the merchandise."

19 U.S.C. § 1673.  See also Shandong Rongxin, 331 F. Supp. 3d at 1394.  Here, Icdas and Habaş

challenge Commerce's duty drawback methodology, and Habaş additionally challenges

Commerce's methodology for imputing credit expenses on home market sales.  In the discussion

section below, the court addresses the relevant legal framework for the duty drawback and credit

expense calculations, respectively.

### II.     Factual and Procedural History

On March 28, 2017, Charter Steel, Gerdau Ameristeel US Inc., Keystone Consolidated

Industries, Inc. ("Keystone"), and Nucor Corporation (collectively, "petitioners"), all domestic

producers of wire rod, filed with Commerce AD petitions concerning imports of wire rod from several countries, including Turkey.  See Carbon and Alloy Steel Wire Rod From Belarus, Italy, the Republic of Korea, the Russian Federation, South Africa, Spain, the Republic of Turkey, Ukraine, United Arab Emirates, and United Kingdom: Initiation of Less-Than-Fair-Value Investigations, 82 Fed. Reg. 19,207, 19,207 (Dep't Commerce Apr. 26, 2017), P.R. 8 ("Initiation Notice").  Petitioners alleged that "imports of wire rod from Belarus, Italy, Korea, Russia, South Africa, Spain, Turkey, Ukraine, the UAE, and the United Kingdom are being, or are likely to be, sold in the United States at less than fair value . . . and that such imports are materially injuring, or threatening material injury to, an industry in the United States."  Id.  On April 26, 2017, Commerce announced its initiation of an AD duty investigation into wire rod imported into the United States from these countries for the period beginning January 1, 2016 through December 31, 2016 (the "period of interest," or "POI").  Id. at 19,207, 19,211.  On May 18, 2017, within forty-five days of the date on which the petition was filed, the ITC preliminarily determined that "there is a reasonable indication that an industry in the United States is materially injured by reason of imports of wire rod from . . . Turkey."  See Carbon and Certain Alloy Steel Wire Rod From Belarus, Italy, Korea, Russia, South Africa, Spain, Turkey, Ukraine, United Arab Emirates, and the United Kingdom, 82 Fed. Reg. 22,846, 22,846 (Int'l Trade Comm'n May 18, 2017).

On October 31, 2017, Commerce published its preliminary determination, finding that certain wire from Turkey "is being, or is likely to be, sold in the United States at less than fair value . . . ."  Carbon and Alloy Steel Wire Rod From Turkey: Preliminary Affirmative Determination of Sales at Less Than Fair Value, and Preliminary Negative Determination of Critical Circumstances, 82 Fed. Reg. 50,377, 50,377 (Dep't Commerce Oct. 31, 2017), P.R. 989.  Commerce determined AD duty rates for mandatory respondents Icdas and Habaş of 8.01 percent

and 2.80 percent respectively, as well as an all-others rate of 5.41 percent.  <u>Id.</u> at 50,378.  As part

of this preliminary determination, Commerce concluded that Icdas and Habaş were eligible for a

duty drawback adjustment to export price.  <u>See</u> Memorandum from J. Maeder to G. Taverman, re:

Decision Memorandum for the Preliminary Determination and Negative Determination of Critical

Circumstances, 10–11 (Dep't Commerce Oct. 24, 2017), P.R. 951 ("Preliminary Determination

Memo").   Pursuant to 19 U.S.C. § 1677a(c)(1)(B), Commerce determined that the Inward

Processing Regime, through which Turkey rebated duties paid on goods imported into Turkey

upon exportation of these goods, met the requirements for a duty drawback adjustment because it

"1) projected quantities of imports; and 2) projected quantities of exports of wire rod based on an

approved production yield/loss ratios . . . ."  <u>Id.</u> at 10.  Commerce explained that "[s]ince [Icdas

and Habaş] have satisfied the criteria described above, we have granted a duty drawback

adjustment to both companies consistent with our practice."  <u>Id.</u>  In calculating the duty drawback

adjustment, Commerce employed a "duty neutral" methodology, which allocated duty drawback

over "all production for the relevant period . . . ."  <u>Id.</u> at 11.

Commerce also adjusted Habaş's short-term home market borrowing rate ("home market

borrowing rate") to impute credit expenses on home market sales price.  Commerce rejected the

zero-percent borrowing rate reported by Habaş because it found that it did "not conform with

commercial reality."   Analysis for the Preliminary Determination of the Less-Than-Fair-Value

Investigation of Carbon and Alloy Steel Wire Rod from Turkey, 3 (Dep't Commerce Oct. 24,

2017), P.R. 973.  Commerce instead used the Central Bank of Turkey's average short-term lending

rate of 10.23 percent (the "TCB rate").  <u>Id.</u>

Following the preliminary determination, Icdas and Habaş filed case briefs challenging

certain aspects of Commerce's margin calculations in an administrative proceeding.  <u>See</u> Case

Brief of Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S., (Feb. 21, 2018), P.R. 1119 ("Icdas Case Brief"); Case Brief of Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.S., (Feb. 21, 2018), P.R. 1089 ("Habaş Case Brief").  Both Icdas and Habaş challenged Commerce's methodology for calculating the duty drawback adjustment, an adjustment Commerce makes to export price, see Discussion infra Sec. I. A., which allocated duty drawback over total production (the "duty neutral methodology"), see Discussion infra Sec. I. A. 3.  See also Icdas Case Brief at 2; Habaş Case Brief at 2.  Additionally, Habaş objected to Commerce's use of the TCB rate in lieu of its zero-percent home market borrowing rate to calculate home market credit expenses.  Habaş Case Brief at 16.  Nucor also submitted a case brief to Commerce, in which it argued that Commerce should continue to apply (1) the duty neutral methodology to calculate the duty drawback adjustment for Icdas and Habaş; and (2) the TCB rate of 10.23 percent as Habaş's home market borrowing rate.  Rebuttal Brief of Nucor Corporation, 2, 11–12 (Feb. 26, 2018), P.R. 1189.

In its final determination, issued on March 28, 2018, Commerce assigned AD margins for Icdas and Habaş of 7.94 percent and 4.74 percent, respectively, and an "All Others" rate of 6.34 percent.  Carbon and Alloy Steel Wire Rod from Turkey: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 83 Fed. Reg. 13,249, 13,250 (Dep't Commerce Mar. 28, 2018), P.R. 1285 ("Final Determination").  Commerce explained in an accompanying issues and decisions memorandum ("IDM") that it calculated the duty drawback adjustment for the final determination consistent with the methodology employed in the preliminary determination, thereby rejecting Icdas's and Habaş's arguments.  Memorandum from J. Maeder to G. Taverman, re: Issues and Decision Memorandum for the Final Affirmative Determination and Negative Determination of Critical Circumstances, 9 (Dep't Commerce Mar. 19, 2018), P.R. 1273 ("IDM").  On May 21, 2018, Commerce amended the final determination to

use rates of 7.94 percent and 4.93 percent for Icdas and Habaş, respectively, due to ministerial errors.  Amended Final Determination at 23,418.

In the IDM accompanying Commerce's final determination, Commerce also made its position clear -- that Habaş's zero-interest loans did not reflect "usual commercial behavior."  IDM at 17.  Commerce thus continued to use the average home market borrowing rate provided by Nucor to calculate Habaş's home market credit expenses in the final determination.  Id.

Icdas filed a summons on June 19, 2018 and a complaint against the United States ("the Government") on July 19, 2018 to challenge Commerce's final determination.  Icdas's Summons, ECF No. 1; Icdas's Compl., ECF No. 8.  Nucor filed a consent motion to intervene as defendant-intervenor on August 9, 2018, and the court granted the motion on August 10, 2018.  Nucor's Mot. to Intervene, ECF No. 11; Court's Order Granting Nucor's Mot. to Intervene, ECF No. 15.  On August 17, 2018, Charter Steel and Keystone filed consent motions to intervene as defendant-intervenors, which the court granted on August 22, 2018.  Charter Steel and Keystone's Mot. to Intervene, ECF No. 17; Court's Order Granting Charter Steel and Keystone's Mot. to Intervene, ECF No. 21.

Habaş commenced a separate action against the Government to challenge Commerce's final determination, filing a summons on June 19, 2018 and a complaint on July 12, 2018.  Habaş's Summons, Habaş v. United States, No. 18-145 (CIT filed June 19, 2018), ECF No. 1; Habaş's Compl., Habaş, No. 18-145, ECF No. 6.  Nucor, Charter Steel, and Keystone joined the action as defendant intervenors.  Nucor's Mot. to Intervene, Habaş, No. 18-145, Aug. 9, 2018, ECF No. 9; Court's Order Granting Nucor's Mot. to Intervene, Habaş, No. 18-145, Aug. 10, 2018, ECF No. 13; Charter Steel and Keystone's Mot. to Intervene, Habaş, No. 18-145, Aug. 10, 2018, ECF No.

14; Court's Order Granting Charter Steel and Keystone's Mot. to Intervene, <u>Habaş</u>, No. 18-145, Aug. 22, 2018, ECF No. 21.

On September 20, 2018, the parties filed a motion to consolidate Habaş's action (No. 18-145) with the lead case brought by Icdas (No. 18-143). Joint Mot. to Consol. Cases, ECF No. 23. The court granted the motion to consolidate on September 26, 2018. ECF No. 26. Habaş filed its brief on January 4, 2019. Cons.-Pl.'s Mot. for J. on Agency R. 56.2, ECF No. 29 ("Cons.-Pl.'s Br."). Icdas filed its brief on January 7, 2019. Pl.'s Mot. for J. on Agency R. 56.2, ECF No. 30 ("Pl.'s Br."). The Government responded on April 26, 2019. Def.'s Resp. to Mot. for J. on Agency R., ECF No. 31 ("Def.'s Br."). Nucor responded on May 10, 2019. Def.-Inter.'s Resp. to Mot. for J. on Agency R., ECF No. 33 ("Def.-Inter.'s Br."). Icdas and Habaş replied on May 24, 2019. Pl.'s Reply Br. in Support of Mot. for J. on Agency R., ECF No. 35 ("Pl.'s Reply"); Cons.-Pl.'s Reply Br. in Support of Mot. for J. on Agency R., ECF No. 34 ("Cons.-Pl.'s Reply Br."). Oral argument was held on November 21, 2019. ECF No. 50.

## DISCUSSION

Icdas and Habaş challenge Commerce's final determination because they argue that the duty neutral methodology employed by Commerce to calculate the duty drawback adjustment contradicts the plain language of 19 U.S.C. § 1677a(c), resulting in higher AD duties on their exports of wire rod from Turkey. Pl.'s Br. at 3–4, Cons.-Pl.'s Br. at 6. Habaş, moreover, also argues that Commerce's reliance on a surrogate rate, in lieu of using Habaş's actual zero-interest borrowing rate, to impute its credit expenses on home market sales is unreasonable and unsupported by substantial evidence. Cons.-Pl.'s Br. at 20. For the reasons stated below, the court remands Commerce's duty neutral methodology because it is not in accordance with law.

The court sustains Commerce's use of the surrogate home market borrowing rate for Habaş because it is supported by substantial evidence and in accordance with law.

     **I.**      ***Commerce's Duty Neutral Methodology for Calculating the Duty Drawback Adjustment Is Not in Accordance With Law.***

Icdas and Habaş first challenge Commerce's duty neutral methodology for calculating the duty drawback adjustment because, they argue, it is inconsistent with the plain language of 19 U.S.C. § 1677a(c), which links duty drawback to U.S. exports. The court turns first to the statutory framework governing duty drawback before turning to the merits of Icdas and Habaş's challenge to the duty neutral methodology. The court then concludes that Commerce's duty neutral methodology contravenes the plain language of the statute and thus fails the first prong of <u>Chevron</u>. <u>See</u> 467 U.S. at 842. Accordingly, the court remands Commerce's duty neutral methodology and need not reach whether Commerce's interpretation was a permissible construction of the statute under the second prong of <u>Chevron</u>. <u>See</u> <u>id.</u> at 843.

     **A. Legal Background on Duty Drawback Adjustment**

     ***1. Statutory Framework Governing the Duty Drawback Adjustment***

To calculate AD duties, Commerce determines the amount by which "normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673. Normal value is generally the price at which a good is sold in the exporting country, 19 U.S.C. § 1677b(a)(1)(B), while export price is the price at which it is sold in the United States, 19 U.S.C. § 1677a(a). <u>See also</u> <u>Uttam Galva Steels Ltd. v. United States</u>, 42 CIT __, __ 311 F. Supp. 3d 1345, 1350 (2018); <u>id.</u> 43 CIT __, 374 F. Supp. 3d 1360 (2019); <u>id.</u> 43 CIT __, Slip Op. 19-168 (Dec. 18, 2019).

Specifically, normal value is defined as "the price at which the foreign product is first sold . . . for consumption in the exporting country . . .." 19 U.S.C. § 1677b(a)(1)(B)(i). When

Commerce has reasonable grounds to believe that sales of the foreign like product were made at a

price less than the cost of production, Commerce may disregard such sales in determining normal

value.  19 U.S.C. § 1677b(b)(1).  The core elements of cost of production are "(1) the cost of

manufacture; (2) 'selling, general, and administrative expenses'; and (3) packaging expenses."

Saha Thai Steel Pipe (Pub.) Co. v. United States, 635 F.3d 1335, 1338 (Fed. Cir. 2011) (quoting

19 U.S.C. § 1677b(b)(3)).  If no sales are left after disregarding sales made at less than the cost of

production, "normal value shall be based on the constructed value of the merchandise." 19 U.S.C.

§ 1677b(b)(1).  Constructed value "includes the same or similar elements as [cost of production],

but with the additional component of profit."  Saha Thai, 635 F.3d at 1338 (citing 19 U.S.C. §

1677b(e)).

Export price instead is the price at which the subject merchandise is first sold before the

date of importation by the foreign exporter to an unaffiliated purchaser in the United States.  19

U.S.C. § 1677a(a).  The determination of export price is subject to several possible adjustments,

including the duty drawback adjustment to export price at issue here.  See 19 U.S.C. § 1677a(c).

The statute provides the following:

> (c) Adjustments for export price and constructed export price
> The price used to establish export price and constructed export price shall be--
> > (1) increased by—
> > > . . .
> > > (B) the amount of any import duties imposed by the country of
> > > exportation which have been rebated, or which have not been
> > > collected, by reason of the exportation of the subject merchandise to
> > > the United States . . .

19 U.S.C. § 1677a(c).  "In other words, if a foreign country would normally impose an import duty

on an input used to manufacture the subject merchandise, but offers a rebate or exemption from

the duty if the input is exported to the United States, then Commerce will increase [export price]

to account for the rebated or unpaid import duty (or, the 'duty drawback')."  Saha Thai, 635 F.3d

at 1338.  The duty drawback adjustment is intended "to account for the fact that the producers

remain subject to the import duty when they sell the subject merchandise domestically, which

increases home market sales prices and thereby increases [normal value]." Id.  By adjusting export

price to reflect duty drawback, the adjustment ensures "a fair comparison between normal value

and export price." Tosçelik Profil v. Sac Endüstrisi A.S., 42 CIT __, 321 F. Supp. 3d 1270, 1275

(2018) (citing Saha Thai, 635 F.3d at 1338 (other citations omitted)); id. 43 CIT __, __, 375 F.

Supp. 3d 1312 (2019); id. 43 CIT __, __, Slip Op. 19-166 (Dec. 18, 2019)).

Commerce relies on a two-pronged test to determine if a foreign exporter is entitled to a

duty drawback adjustment.  Saha Thai, 635 F.3d at 1340.  The foreign exporter must demonstrate

> (1) that the rebate and import duties are dependent upon one another, or in the
> context of an exemption from import duties, that the exemption is linked to the
> exportation of the subject merchandise, and (2) that there are sufficient imports of
> the raw material to account for the duty drawback on the exports of the subject
> merchandise.

Id. (citations omitted).

### 2.  Commerce's Past Methodology for Calculating the Duty Drawback Adjustment

Prior to adopting the duty neutral methodology at issue here, Commerce's practice was to

calculate the duty drawback adjustment to the export price by adjusting export price, pursuant to

19 U.S.C. § 1677a(c)(1)(B).  See Habaş Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United

States, 43 CIT __, __ 361 F. Supp. 3d 1314, 1320 (2019); id. 43 CIT __, __, Slip Op. 19-130 (Oct.

17, 2019).  The parties do not dispute that Commerce previously calculated the duty drawback

adjustment by allocating the duties rebated or not collected by a foreign government over U.S.

sales, and this per unit amount was then added to export price.  See Pl.'s Br. at 10; Cons.-Pl.'s Br.

at 12; Def.'s Br. at 13; Def.-Inter.'s Br. at 3.  See also Tosçelik, 321 F. Supp. 3d at 1276 ("Under

its previous practice, Commerce divided the amount rebated or forgiven by the exported quantity

to determine the duty burden borne by each unit of merchandise sold in the United States.").   In

Saha Thai, the Federal Circuit upheld a corresponding modification to cost of production, which

is incorporated into constructed value and ultimately the normal value.  635 F.3d at 1344.  The

adjustment to cost of production adds the duties not collected as a result of an exemption-based

duty drawback program into cost of production so that the normal value reflects the cost of goods

as if all goods were sold in the exporting country instead of having been exported to the United

States.  Id.

### 3.  *Commerce's Current Duty Neutral Methodology*

Commerce's methodology for calculating the duty drawback adjustment in this case, and

other recent AD investigations, departs from the past practice described above.  See IDM at 9–11;

Def.'s Br. at 14.   After Commerce determined that Icdas and Habaş were eligible for the

adjustment, as Turkey's Inward Processing Regime satisfied both prongs of Saha Thai, 635 F.3d

at 1340, Commerce then employed what it calls a "duty neutral approach" to calculate the duty

drawback adjustment.  See Preliminary Determination Memo at 10–11; IDM at 9–11.  This

methodology adjusts export price to account for the duty drawback by dividing the duty drawback

by the total cost of production, instead of by total U.S. sales.  Id.  As Commerce explained in the

IDM, "to ensure that the comparison of [export price] with [normal value], . . . Commerce will

make the duty drawback adjustment to [export price] in a manner that will render this comparison

duty neutral."[2]  IDM at 9.  See also Habaş, Slip Op. 19-130.[3]  Commerce here "made an upward

adjustment to [export price] based on the amount of the duty imposed on the input and rebated or

not collected on the export of the subject merchandise by allocating the amount rebated or not

collected to all production for the relevant period based on the cost of inputs during the POI."  IDM

at 9.  The calculation is otherwise the same as described above.

### B.  Analysis of Commerce's Duty Neutral Methodology

Icdas and Habaş both challenge Commerce's duty neutral methodology as contrary to the

plain language of 19 U.S.C. § 1677a(c)(1)(B).  Pl.'s Br. at 12–13; Cons.-Pl.'s Br. at 6.  Thus, they

argue, Commerce's interpretation of 19 U.S.C. § 1677a(c)(1)(B) fails the first prong of Chevron

analysis.  See Pl's Br. at 12–13; Cons.-Pl.'s Br. at 16.  Icdas contends that Commerce's new duty

---

[2] Commerce explained its reasoning behind duty neutral methodology in the Issues and Decisions Memorandum:

> A duty drawback adjustment to export price [] is based on the principle that the 'goods sold in the exporter's domestic market are subject to import duties while exported goods are not.'  In other words, home market sales prices and cost of production [] may be import duty 'inclusive,' while U.S. (and third-country) export sales prices are import duty 'exclusive.'  Therefore, this inconsistency in whether prices or costs are import duty exclusive or inclusive will result in an imbalance in the comparison of [export price] with normal value [].  Thus, it is incumbent on Commerce to ensure that the comparison of [export price] with [normal value] is undertaken on a duty neutral basis.

Memorandum from J. Maeder to G. Taverman, re: Issues and Decision Memorandum for the Final Affirmative Determination and Negative Determination of Critical Circumstances, 9 (Dep't of Commerce Mar. 19, 2018) ("IDM"), P.R. 1273.

[3] In Habaş, the court summarized Commerce's rationale for its new duty neutral methodology:

> Commerce reasoned that 'the larger denominator on the cost-side [i.e., total production] resulted in a smaller adjustment to normal value than U.S. price'; consequently, it determined that 'equalizing the denominators used in each adjustment' ensured that an equal amount would be added to U.S. price and normal value and the agency would compare the two values on a 'duty neutral' basis.

Slip Op. 19-130 (citations omitted).

neutral methodology "deviated from the statutory language and effectively granted Icdas an adjustment to U.S. price representing only a fraction of actual duty exemptions earned on U.S. sales." Pl.'s Br. at 12.  According to Icdas, the plain language of the statute "requires a full upward adjustment to U.S. price related to exportation, not production."  Id. at 13.  Thus, according to Icdas, "[h]aving found that Icdas satisfied its requirements for a duty drawback adjustment, Commerce should have simply granted Icdas a full duty drawback adjustment to U.S. price by dividing the amount of the uncollected duty by Icdas's total exports as reported by Icdas in its U.S. sales listing, in accordance with its usual practice."  Id. at 11.  Habaş, likewise, argues that "[a]pplying the cost-side adjustment to [the U.S. price] unlawfully dilutes the adjustment" because "it does not adjust fully for the duties drawn back on U.S. exports . . .."  Cons.-Pl.'s Br. at 10. Instead, Habaş contends, "the law requires Commerce to base the U.S. sales drawback adjustment on the ratio of the total duties foregone divided by total exports – that is, the denominator must be related to export sales and not to total cost of manufacture."  Id.

The Government refutes Icdas and Habaş's contentions, instead arguing that the statute is "silent regarding how duty drawbacks are to be allocated and does not require a specific denominator."  Def.'s Br. at 15.  According to the Government, "[h]ad Congress intended to limit Commerce's discretion in performing the [export price/constructed export price] duty drawback calculation as Habaş and Icdas contend, the statute would state that for each unit of subject merchandise exported, the [export price/constructed export price] shall be increased by the amount of duty rebated or not collected on that unit.  But the statute does not contain those instructions." Id. at 16.  The Government, therefore, argues that because the statute is silent as to the denominator, the court instead must ask under the second step of Chevron "whether Commerce's interpretation constitutes a permissible construction of the statute."  Def.'s Br. at 16 (citing Chevron, 467 U.S.

at 843).   Here, the Government contends, "'any reasonable construction of the statute is a

permissible construction,'" Def.'s Br. at 6 (quoting Timken Co. v. United States, 354 F.3d 1334,

1342 (Fed. Cir. 2004) (quoting Torrington Co. v. United States, 82 F.3d 1039, 1044) (Fed. Cir.

1996))).   The Government further asserts that "Commerce is . . . free to fill that [statutory] gap—

as it has done with its duty neutral methodology—provided its interpretation is a reasonable

construction of the statute."  Def.'s Br. at 6 (citing Chevron, 467 U.S. at 843).

        The court finds unavailing the Government's contention that the statute is silent regarding

how duty drawbacks are to be allocated.  In providing for the duty drawback adjustment, 19 U.S.C.

§ 1677a(c)(1)(B) states that export price shall be increased by "the amount of any import duties

imposed by the country of exportation which have been rebated, or which have not been collected,

by reason of the exportation of the subject merchandise to the United States" (emphasis added).

Contrary to the Government's assertion, therefore, the statute is not silent on this issue; instead, it

explicitly states that the export price should be increased by the amount of import duties rebated

or not collected because of exportation of the merchandise.  See 19 U.S.C. § 1677a(c)(1)(B).  The

plain language, moreover, provides no indication that the duty drawback should instead be tied to

overall production.

        The court's conclusion that the duty neutral methodology is inconsistent with the plain

language of 19 U.S.C. § 1677a(c)(1)(B) aligns with the court's recent holdings in at least five other

duty drawback cases.  See Tosçelik, 321 F. Supp. 3d at 1278 ("By including costs associated with

manufacturing goods sold in the domestic market, [Commerce's] methodology lessens the

upwards adjustment, and conceptually reintroduces an imbalance in the dumping margin

calculation."); Habaş, 361 F. Supp. 3d at 1322 (the "allocation of foregone duties over total

production is inconsistent with the clear statutory linkage between those duties and exported

merchandise"); Ereğli Demir ve Çelik Fabrikalari T.A.Ş v. United States, 42 CIT __, __, 357 F.

Supp. 3d 1325, 1333 (2018); id., 43 CIT __,__, Slip Op 19-135 (Oct. 23, 2019) ("[I]nstead of

calculating the amount of the adjustment on the basis of duties foregone solely in relation to the

exported merchandise eligible for drawback, as the statute requires, Commerce has calculated an

amount that is based on the distribution of some of the exempted duties to domestic sales, which

is contrary to the statute's plain language"); Uttam, 311 F. Supp. 3d at 1355 (The duty neutral

methodology "fails to adequately connect the adjustment to duties forgiven "by reason of" the

products' exportation to the United States."); Rebar Trade Action Coal. v. United States, 40 CIT

__, __, 38 ITRD 1730 (2016) ("The [U.S. price] adjustment for drawback, being causally related

to exportation, not production, is allocable only to the exports to which it relates").   In each

instance, the court found that Commerce's duty neutral methodology contravened the plain

language of the statute because it failed to tie the duty drawback adjustment to exported

merchandise.  See id.

The legislative history of 19 U.S.C. § 1677a(c)(1)(B) further supports that the duty neutral

methodology fails the first prong of Chevron.  This section was enacted in its current form through

the Uruguay Round Agreements Act.  Uruguay Round Agreements Act, Pub. L. No. 103–465, §

223, 108 Stat. 4809, 4876 (1994).  The Statement of Administrative Action ("SAA"),[4] which was

adopted with the Act, stated that Commerce "will calculate export price and constructed export

price by adding to the starting prices . . . import duties that are rebated or not collected due to the

exportation of the merchandise (duty drawback) . . .."  Uruguay Round Agreements Act, Statement

---

[4]  The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, 656, 822–23 (1994), reprinted in 1994

U.S.C.C.A.N. 4040, 4163 ("SAA").  Thus, the SAA explicitly tied duty drawback to exportation,

not production, of merchandise.

The Government argues that the lack of an explicit methodology in the legislative history

indicates that Congress has "left the selection of methodology to the reasonable exercise of the

agency's discretion."  Def.'s Br. at 16 (citing Chevron, 467 U.S. at 843).  The Government also

points out that "the SAA states that under 19 U.S.C. § 1677a(c)(1), Commerce will add to the

[export price] 'import duties that are rebated or not collected due to the exportation of the

merchandise (duty drawback)'."  Id. at 16 (citing SAA at 823).  The Government is correct that

this language does not articulate a specific calculation methodology.  However, this language does

not support Commerce's contention that the plain language of the statute was ambiguous and that

Commerce was reasonable in dividing the duty drawback over domestic sales, to which the

drawback is unrelated, before adding the drawback to the export price.  To the contrary, this

legislative history is consistent with the Congressional intent discernable from the statutory text

and supports a calculation which fully adjusts export price for the duties that would have been paid

but for the exportation of the merchandise to the United States.

The plain language of the statute, persuasive case law from this court, and the legislative

history all support the proposition that the duty drawback must be tied to exported merchandise,

not overall domestic production.  The court, therefore, concludes that Commerce's duty neutral

methodology is contrary to the plain language of the statute and thus fails the first prong of

Chevron.  See 467 U.S. at 842–43.  Accordingly, the duty neutral methodology is contrary to law

and the court remands Commerce's duty drawback methodology with instructions to recalculate

the duty drawback adjustment in accordance with this opinion.

## II.   *Commerce's Reliance on a Surrogate Rate to Impute Credit Expenses Is in Accordance with Law and Supported by Substantial Evidence.*

Habaş next challenges Commerce's reliance on a surrogate rate, in lieu of Habaş's zero-interest loans, to impute credit expenses on home market sales, alleging that Commerce's approach is both contrary to law and unsupported by substantial evidence.  Cons.-Pl.'s Br. at 20.  Habaş argues that "Commerce has no factual basis for finding that the zero-interest loans from unaffiliated banks are not commercial other than the bald fact that the interest rate, zero, is different from the 10.23 percent average short-term rate for all companies nationwide." Id. at 26.  The court, however, concludes that Commerce's determination that Habaş's short-term borrowing rate was non-commercial, and subsequent use of a surrogate rate, comports with established Federal Circuit precedent requiring the cost of credit to "be imputed on the basis of usual and reasonable commercial behavior."  LMI-La Metalli Industriale, S.p.A. v. United States, 912 F.2d 455, 461 (Fed. Cir. 1990).  Additionally, contrary to Habaş's assertions, the surrogate rate relied on by Commerce is supported by substantial evidence.  The court therefore sustains Commerce's reliance on a surrogate rate to impute credit expense on home market sales.

### A.   *Legal Standards for Imputing Credit Expense on Home Market Sales*

When calculating normal value, 19 U.S.C. § 1677b(a)(6)(C)(iii) "authorizes Commerce to adjust normal value to account for any differences (or lack thereof) between the export price (or constructed export price) and normal value that are wholly or partly due to differences in the circumstance of sale ("COS") between sales made in the U.S. and sales made in the foreign market under consideration."  Hornos Electricos de Venezuela v. United States, 27 CIT 1522, 1538, 285 F. Supp. 2d 1353, 1368 (2003) (citing 19 U.S.C. § 1677b(a)(6)(C)).  The regulation implementing this section of the statute, 19 C.F.R. § 351.410, directs Commerce to adjust for "direct selling expenses," such as credit expenses.  See 19 C.F.R. § 351.410(b)–(c).  Accordingly, Commerce

adjusts normal value to reflect that a foreign firm "incurs certain costs in its home market sales

that it does not incur when selling in the U.S. market." Hornos Electricos, 285 F. Supp. 2d at 1368

(citing Torrington, 156 F.3d at 1363).  With respect to credit expenses, in a policy bulletin released

in 1998, Commerce described this adjustment as follows:

> The Department has long recognized that greater credit expenses are associated
> with longer terms of payment, and that these credit expenses are usually built into
> the price of the sale.  For example, if a respondent requires U.S. customers to pay
> within 30 days of shipment but allows home market customers 120 days, the
> respondent incurs greater credit expenses in the home market, because money a
> company receives after 120 days has a lower present value than the same amount
> of money received within 30 days.  These credit expenses may also be thought of
> as the opportunity cost of money: they are the cost to the respondent for not
> receiving immediate payment for its sales.

U.S. Dep't of Commerce, Import Administration Policy Bull. No. 98.2, Imputed Credit Expenses

and Interest Rates (Feb. 23, 1998), https://enforcement.trade.gov/policy/bull98-2.htm ("Policy

Bulletin 98.2").  In other words, Commerce adjusts normal value to reflect that the credit expenses

accompanying a firm's domestic sales account for different payment times across foreign and

domestic markets, i.e. the time value of money.[5]  In making the adjustment, Commerce "measures

the credit expense on a sale by the amount of interest that the sale revenue would have earned

between date of shipment and date of payment."  Id.  This expense is referred to as the "imputed

credit expense," and appropriate adjustments are made to the normal value and export price.

Policy Bulletin 98.2 then sets forth Commerce's policy for selecting a rate for imputed

credit expense relating to foreign market sales.  See id.  The policy favors using existing short-

---

[5] "The time value of money (TVM) is the concept that money available at the present time is worth more than the identical sum in the future due to its potential earning capacity.  This core principle of finance holds that provided money can earn interest, any amount of money is worth more the sooner it is received.  TVM is also sometimes referred to as present discounted value."  James Chen, Time Value of Money (TVM), Investopedia.com (Sept. 25, 2019), https://www.investopedia.com/terms/t/timevalueofmoney.asp.

term borrowings in the currency of the home country, when such borrowings exist.  Id.  "Where

respondents have no U.S. dollar short-term loans," however, Policy Bulletin 98.2 provides for use

of a surrogate rate.  Id.  Policy Bulletin 98.2 provides three criteria to determine a suitable surrogate

rate: "1) the surrogate rate should be reasonable; 2) it should be readily obtainable and predictable;

and 3) it should be a short-term interest rate actually realized by borrowers in the course of 'usual

commercial behavior' in the United States."  Id.  The Federal Circuit emphasized the third

criterion, that the imputed cost of credit conforms with commercial reality, in LMI:

> [T]he imputation of credit cost itself is a reflection of the time value of money, and
> hence commercial practice.  The time value of money is not an arbitrary fiction, but
> must correspond to a dollar figure reasonably calculated to account for such value
> during the gap period between delivery and payment.  If the cost of credit is imputed
> in the first instance to conform with commercial reality, it must be imputed on the
> basis of usual and reasonable commercial behavior.

912 F.2d at 460–61.  As addressed below, Commerce applied Policy Bulletin 98.2 to impute credit

expenses to Habaş.

### B.  Commerce's Reliance on a Surrogate Rate to Impute Credit Expenses

Commerce's cost verification report found that Habaş "obtained commercial loans

denominated in Turkish Lira and U.S. dollars from an affiliated company, Anadolubank, during

the POI."  Memorandum from P. Scholl to the File re: Verification of Cost Response of Habaş

Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. in the Antidumping Duty Investigation of Carbon

and Alloy Steel Wire Rod from Turkey, 5 (Dep't Commerce Feb. 12, 2018), P.R. 1059 ("Habaş

CVR").  The interest rate on these loans was zero percent.  IDM at 16–17.  Commerce determined

that these zero-interest loans were not an appropriate basis to calculate the short-term interest rate,

stating Habaş's "zero-interest rate loans put it in the same position as a company that reports having

no short-term commercial borrowings, and for which Commerce would use an appropriate

surrogate short-term interest rate."  Id. at 18

Commerce then found that Habaş's "short-term interest rate does not meet the criteria of being reasonable or representative of usual commercial behavior, as Turkish short-term publicly available rates differ significantly from that of Habaş" and determined that use of a surrogate rate was necessary.  Id. at 18.  Commerce also noted that it was "reasonable to use a publicly available interest rate to impute the credit expense that properly reflects the time value of money in this situation."  Id.  Commerce then adopted the TCB rate as the surrogate short-term borrowing rate for Habaş.  As addressed below, Habaş challenges Commerce's use of a surrogate rate as both contrary to law and unsupported by substantial evidence.

### C.  Analysis of Commerce's Use of a Surrogate Rate to Impute Credit Expenses

Habaş contends that "Commerce's finding of non-commerciality is not supported by substantial evidence and is inconsistent with Commerce's treatment of zero-interest loans in other cases, where Commerce explicitly held such loans to be commercial."  Cons.-Pl.'s Br. at 20.  The Government, however, argues that substantial evidence supported Commerce's decision "to equate a zero-interest rate loan with the absence of short-term borrowing," Def.'s Br. at 38, and to instead use a surrogate rate, as Habaş's "reported zero percent short term interest rates to calculate home market credit expenses . . . were not representative of usual commercial behavior," id. at 31 (citing IDM at 17–18).  The court concludes that Commerce's reliance on a surrogate rate, where the reported rate was not appropriate for imputation of credit expenses, was supported by substantial evidence and in accordance with law.

### III.  Commerce's Use of a Surrogate Rate Instead of Habaş's Reported Short Term Borrowing Rate Is Supported by Substantial Evidence.

Habaş first argues that Commerce lacked a "factual basis for finding that the zero-interest loans from unaffiliated banks are not commercial other than the bald fact that the interest rate, zero, is different from the 10.23 percent average short-term rate for all companies nationwide."

Cons.-Pl.'s Br. at 26.  Habaş further contends that Commerce has made no showing as to why

Habaş's interest rate should "approximate the average borrowing experience of all Turkish

companies" and noted that all its loans were overnight loans, which typically have a lower average

borrowing rate than loans reflected by the average short-term TCB rate used by Commerce. Id. at

27.  Zero percent interest, according to Habaş, "does not make [its loans] noncommercial." Id.

The Government, however, argues that Commerce's use of a surrogate rate was supported by

substantial evidence on the record and in accordance with law because Habaş's zero-interest loans

were akin to no short-term borrowings and thus inappropriate for imputing credit expenses.  Def.'s

Br. at 38.

        Pursuant to 19 U.S.C. § 1677b(a)(6)(C)(iii), 19 C.F.R. § 351.410(c), and Policy Bulletin

98.2, Commerce adjusted for the difference in export price and normal value due to circumstances

of sale, including direct selling expenses like credit expenses.  The court is unpersuaded by Habaş's

contention that (1) Commerce determined that the loans were noncommercial, and (2) using the

term "commercial loans" in the verification report undercut the reasonableness of Commerce's

decision to use a surrogate rate.  First, "Commerce . . . never stated that Habaş's loans were non-

commercial; rather, Commerce found that Habaş's short-term interest rate associated with those

loans was not 'reasonable or representative of usual commercial behavior' when considering the

appropriate rate with which to impute revenue derived from prepayment." See Habaş, 361 F.

Supp. 3d at 1332.  Second, contrary to Habaş's assertions, the verification report's consideration

of the zero-interest loans as commercial has no bearing on whether the loans are reflective of usual

commercial behavior such that they would be an appropriate basis for determining the opportunity

cost which accompanies prepayment.  Commerce did state in the cost verification report that Habaş

"also obtained commercial loans denominated in Turkish Lira and U.S. dollars from an affiliated

company, Anadolubank, during the POI."   Habaş CVR at 51 (emphasis added).   As the

Government points out, however, it is well established that "verification reports are not final

determinations, but constitute only a collection of facts which, along with other record evidence,

inform Commerce's final determination."   Def.'s Br. at 36 (citing Hyundai Steel Co. v. United

States, 42 CIT __, __ 319 F. Supp. 3d 1327, 1343 (2018) (other citations omitted)).   Indeed, the

verification report itself states that such reports do not "draw conclusions as to whether the reported

information was successfully verified, and further does not make findings or conclusions regarding

how the facts obtained at verification will ultimately be treated in [Commerce's] determinations."

Habaş CVR at 1.

Habaş next argues that Commerce misconstrues the meaning of Policy Bulletin 98.2, "as

the Bulletin favors a respondent's actual borrowing rate, particularly if it is different from some

average rate . . . ."   Cons.-Pl.'s Br. at 28 (emphasis added).   Habaş contends that Policy Bulletin

98.2 establishes a "simple rule": "for the purposes of calculating imputed credit expenses, we will

use a short-term interest rate tied to the currency in which the sales are denominated.   We will base

this interest rate on the respondent's weighted-average short-term borrowing experience in the

currency of the transaction."   Cons.-Pl.'s Br. at 28 (quoting Policy Bulletin 98.2).   As the

Government argues, however, Habaş fails to establish on the record, "whether the particular zero-

interest loans at issue in this investigation represent usual commercial behavior in Turkey."   Def.'s

Br. at 39.   Habaş cites interest rates from the Federal Reserve to show why Habaş's overnight loans

could result in a lower interest rate than a company with a mix of shorter and long-term loans,

Cons.-Pl.'s Br. at 22, but, as the Government highlights, and Commerce noted in the Final

Determination, the data Habaş provided did not include zero-interest loans, Def. Br. at 39 (citing

IDM at 18).   Thus, Habaş failed to establish that its zero-interest loans in fact constituted an actual

short-term borrowing rate.  Id.  The court, therefore, is persuaded by the Government's contention

that the "zero-interest rate loans put [Habaş] in the same position as a company that reports having

no short-term commercial borrowings, and for which Commerce would use an appropriate

surrogate short-term interest rate."  See IDM at 18.

Furthermore, Policy Bulletin 98.2 emphasizes that in the event there are no borrowings in

the home currency, the surrogate rate should be "reasonable, readily obtainable, and representative

of 'usual commercial behavior.'"  Here, Commerce complied with this guidance, explaining that

because Habaş "has no short-term borrowings in the currency of the transaction," any selected

surrogate interest rate "should meet the three criteria . . . [of being] reasonable, readily obtainable,

and representative of 'usual commercial behavior.'"  Def.'s Br. at 38 (citing IDM at 18).

Accordingly, the court concludes that Commerce's decision to use a surrogate rate, to impute credit

expenses "on the basis of usual and reasonable commercial behavior" was not unreasonable.  See

LMI, 912 F.2d at 461.

Habaş further contends that the Government's reliance on LMI to justify Commerce's use

of a surrogate rate is misplaced.  Cons.-Pl.'s Reply at 9.  According to Habaş, LMI stands for the

proposition that "where the respondent had actual dollar borrowings in the [POI], it was error for

Commerce to impute credit on U.S. sales using a foreign-currency rate."  Id. at 9.  Habaş's

misinterprets LMI, however, because the decision was based on the principle that imputed

expenses must be based on reasonable commercial behavior.  See 912 F.2d at 460–61.  In LMI,

the Federal Circuit rejected Commerce's reliance on the home market short-term financing rate of

sixteen percent for imputing credit cost on U.S. sales despite LMI's insistence that it would not

have borrowed in the U.S. at such a high rate.  Id. at 460.  LMI did have some dollar borrowings

during that period which Commerce refused to rely on because "these loans were made to finance

dollar purchases of raw materials, not dollar sales of finished products." Id.  The Federal Circuit found that it was unreasonable to use a home-market borrowing rate to impute credit expenses on U.S. sales because doing so did not conform with "reasonable commercial behavior." Id. at 460–61.  In other words, the Federal Circuit held that it would be unreasonable to impute U.S. credit expenses based on a sixteen percent rate derived from Italian borrowings because if these expenses were actually incurred in the United States, they would have been lower than 9.5 percent. See id. Therefore, LMI stands for the proposition that the rates used to impute expenses should conform with "reasonable commercial behavior." See id. at 460–61.  The court thus concludes Commerce's decision to use a surrogate rate comported with the Federal Circuit's holding in LMI that Commerce should use a rate that reflects "reasonable commercial behavior."

### IV.   Commerce's Decision Not To Use Habaş's Zero-Interest Loan Rate Is Not Arbitrary.

Habaş also argues that Commerce's treatment of zero-interest loans was inconsistent with its past practice of including zero-interest loans within weighted averages used to determine the home market borrowing rate in previous AD duty administrative reviews.  Cons.-Pl.'s Br. at 29–30 (citing Welded Carbon Steel Pipe and Tube From Turkey: Notice of Final Results of Antidumping Duty Administrative Review, 76 Fed. Reg. 76,939 (Dep't Commerce Dec. 9, 2011) ("Carbon Pipe from Turkey"); Welded Line Pipe From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value, 80 Fed. Reg. 61,362 (Dep't Commerce, Oct. 13, 2015) ("Line Pipe from Turkey")).  Habaş points out that inclusion of zero-interest rate loans in the weighted-average, in Carbon Pipe from Turkey and Line Pipe from Turkey, had the effect of increasing the AD margin.  Cons.-Pl.'s Br. at 29.  Habaş contends that Commerce's inclusion of zero-interest rate loans as part of a weighted-average short-term borrowing rate when it increases the AD margin, but refusal to base the rate entirely on only zero-interest rates in a manner that

decreases the AD margin, constitutes "margin engineering at its most blatant."  Cons.-Pl.'s Reply Br. at 11.[6]

The court is not persuaded by Habaş's contention that Commerce's treatment of zero-interest loans in prior administrative reviews forecloses Commerce's ability to reasonably rely on a surrogate rate in this case.  See Cons.-Pl.'s Br. at 29–30 (citing Carbon Pipe from Turkey; Line Pipe from Turkey).  "[A]n agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently."  Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996) (citing Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 57 (1983) (further citations omitted)).  See also Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States, 37 CIT __, 896 F. Supp. 2d 1313, 1325 (2013) (citations omitted). Here, however, the situations differ in key respects.  In Carbon Pipe from Turkey and Line Pipe from Turkey, over the objections of the foreign firms in each case, Commerce included zero-interest loans as part of a weighted average interest rate used to determine home-market credit expense.  See Certain Welded Carbon Steel Pipe and Tube from Turkey: Issues and Decision Mem., A-489-501 (Dep't Commerce Dec. 9, 2011) at Comment 10, 76 ITADOC 76939 ("Carbon Pipe from Turkey IDM");Welded Line Pipe from the Republic of Turkey: Issues and Decision Mem., A-489-822 (Dep't Commerce, Oct. 5, 2015) at Comment 13, 80 ITADOC 61632 ("Line

---

[6] In its reply brief, Habaş explains the reason for the different effects on the AD margin:

> The only real difference between the Turkish pipe cases and the present cases is that in the Pipe cases the respondent had a positive lag between shipment and payment, so that a zero-interest rate reduced imputed credit and thereby increased normal value.  Here, on the other hand, Habaş had a negative lag between payment and shipment (i.e., sales were paid prior to shipment), so that a zero-interest rate would reduce normal value.

Cons.-Pl.'s Reply Br. at 11.

Pipe from Turkey IDM").  Those administrative reviews, however, did not involve instances of

pre-payment.  As the court previously observed in Habaş, 361 F. Supp. 3d 1314 (2019), "Habaş's

reliance on Commerce's prior inclusion of zero-interest loans in its credit expense calculations is

misplaced because the cited determinations do not involve instances of prepayment."  Habaş, 361

F. Supp. 3d at 1332 (citing Carbon Pipe from Turkey IDM at 28–29; Line Pipe from Turkey at 30–

31).  This distinction is relevant because relying on a zero-interest rate in instances of prepayment

would deny that there is any benefit to prepayment at all and cause the imputation of credit expense

in a manner inconsistent with commercial reality.  Commerce's treatment of zero-interest loans in

this case, moreover, is consistent with its treatment of such loans in the administrative review at

issue in the court's earlier decision, Habaş.  See 361 F. Supp. 3d at 1332.

> The Habaş opinion is persuasive and worth quoting at length:
>
> From the outset, Habaş misstates Commerce's basis for rejecting its zero-interest short-term rates. Habaş asserts that Commerce rejected its rates as "non-commercial" and, thus, seeks to persuade the court that its loans are indeed commercial. Commerce, however, never stated that Habaş's loans were non-commercial; rather, Commerce found that Habaş's short-term interest rate associated with those loans was not "reasonable or representative of usual commercial behavior" when considering the appropriate rate with which to impute revenue derived from prepayment. The issue confronting Commerce concerned the proper interest rate with which to calculate the benefit inuring to Habaş from the advance payment, not the loss occasioned by delayed payment. Because longer lending periods are associated with higher interest rates, Commerce determined that applying a zero-interest rate to Habaş's negative receivables would not capture the benefit derived therefrom, and, thus, the rate was not "reasonable or representative of usual commercial behavior," . . . Habaş fails to persuade the court that Commerce should effectively treat prepayment as worthless.

361 F. Supp. 3d at 1332 (citations omitted).[7]  The imputed credit expense adjustment is intended

to reflect the opportunity cost that accompanies selling goods in the domestic market with a longer

---

[7] Habaş argues that Habaş is "not a final decision and remains subject to further appeal, and Commerce's logic in that case was different from its logic here."  Cons.-Pl.'s Reply Br. at 9–10 (citations omitted).

term of payment.  Utilizing zero-interest loans as the basis for imputing credit expense would deny

that there is a benefit to shorter terms of payment.  As the Federal Circuit said in LMI, "[t]he time

value of money is not an arbitrary fiction, but must correspond to a dollar figure reasonably

calculated to account for such value during the gap period between delivery and payment."  912

F.2d at 460–61.  The concept of the time value of money, which is at the core of the adjustment,

requires reliance on a rate which is representative of usual commercial behavior in order to reflect

the opportunity cost that accompanies longer terms of payment.  Here, therefore, using the TCB

rate to impute credit expenses, instead of the zero-interest rate, was not inconsistent with past

practice.[8]  The court thus concludes that Commerce's decision not to use zero-interest loans as the

basis for imputing credit expense on home market sales was not arbitrary.

### V.      Commerce's Choice of a Surrogate Rate Is Supported by Substantial Evidence.

Lastly, the court notes that Habaş offers no alternative to the TCB rate, except for using

the zero-interest rate itself.  In the absence of any evidence on the record to the contrary, the court

thus finds Commerce's reliance on the TCB rate to be reasonable.  See Habaş, 361 F. Supp. 3d at

1333 (citing QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (the burden of

creating an adequate record before Commerce lies with interested parties)).   The TCB rate,

moreover, satisfies Policy Bulletin 98.2's guidance that any surrogate rate should be "reasonable,

readily obtainable, and representative of 'usual commercial behavior.'"

---

[8] Habaş argues that arguments raised by Nucor regarding the time value of money were waived because "Nucor did not make this argument in the proceeding below, and Commerce did not discuss this theory in its ID Memo."  Cons.-Pl.'s Reply Br. at 11 (citing Corus Staal BV v. United States, 502 F.3d 1370, 1378–82 (Fed. Cir. 2007)).  However, the Government also made similar arguments with respect to time value of money, and Commerce discussed the importance of time value of money in the IDM.  See Def.'s Br. at 39–40; IDM at 17–18.

Accordingly, the court sustains Commerce's use of the TCB rate because it is in accordance with law and supported by substantial evidence on the record.  <u>See</u> 19 U.S.C. § 1516a(b)(l)(B)(i).

## CONCLUSION AND ORDER

The court concludes that Commerce's use of the duty neutral methodology to make the duty drawback adjustment in calculating the AD margin was not in accordance with the plain language of the statute.  The court thus remands the duty drawback methodology with instructions to recalculate the adjustment.  The court sustains Commerce's treatment of Habaş's zero-interest borrowing rate and use of a surrogate rate as in accordance with law and supported by substantial evidence.  Commerce shall file with this court and provide to the parties its remand results within 90 days of the date of this order; thereafter, the parties shall have 30 days to submit briefs addressing the revised final determination with the court, and the parties shall have 30 days thereafter to file reply briefs with the court.

**SO ORDERED.**

*/s/   Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: <u>January 28, 2020</u>
        New York, New York